# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-1594V

|  |  |
|---|---|
| JOHN THOMAS,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>             Respondent. | Chief Special Master Corcoran<br><br>Filed: March 2, 2026 |

*Leah V. Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Parisa Tabassian, U.S. Department of Justice, Washington, DC, for Respondent.[1]*

### DECISION AWARDING DAMAGES[2]

On October 25, 2022, John Thomas filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[3] (the "Vaccine Act"). Petitioner alleged that he suffered Guillain-Barré syndrome ("GBS") resulting from an influenza ("flu") vaccine received on October 7, 2019. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. Although entitlement was conceded, the parties could not resolve damages, and

---

[1] Felicia Langel appeared for Respondent at the January 24, 2025 Motions Day hearing.

[2] When this Decision was originally filed, I advised my intent to post it on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), Petitioner filed a timely motion to redact certain information. This decision is being posted with Petitioner's name redacted to reflect his initials only. Except for those changes and this footnote, no other substantive changes have been made. This Decision will be posted on the court's website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc with no further opportunity to move for redaction.

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

therefore the matter was determined at a "Motions Day" proceeding held on February 17, 2026.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$139,015.36, representing $135,000.00 for his actual pain and suffering, and $4,015.36 in unreimbursable out-of-pocket expenses.[4]**

## I.    Relevant Procedural History

The case was activated from "pre-assignment review" on January 26, 2023. (ECF No. 9). Respondent conceded entitlement in Petitioner's favor (ECF No. 20), but the parties reached an impasse in their damages discussions, and on September 24, 2024, Petitioner filed his brief addressing damages. (ECF No. 32). Respondent filed his response on November 8, 2024 (ECF No. 33), and Petitioner replied on November 25, 2024. (ECF No. 34). On December 23, 2025, the parties filed a joint status report confirming that they were amenable to an expedited hearing. The Motions Day hearing occurred on February 17, 2026, and this written decision memorializes my oral ruling issued at the conclusion of the hearing.[5]

## II.    Relevant Factual Evidence

### A.  Medical Records

Petitioner received a flu vaccine on October 7, 2019, at sixty-four years of age. Exhibit ("Ex.") 1 at 1. His medical history prior to vaccination included migraines, bilateral foot neuropathy, and right wrist pain. Ex. 2 at 59-89. Petitioner maintains that "[w]hile the neuropathy was a pre-existing condition, the discomfort was not severe enough to warrant medication, and the pain definitely increased after the GBS diagnosis." Ex. 9 at 2.

On November 8, 2019 (one month after vaccination), Petitioner went to his primary care provider ("PCP") complaining of leg discomfort and weakness. Ex. 2 at 53. The doctor's assessment was myopathy. *Id*. That same day, Petitioner also went to the emergency department ("ED"), complaining of progressive ascending muscle weakness. Ex. 3 at 7-20. Physical examination revealed muscle strength of 4/5 and abnormal sensation in the legs. *Id*. at 11. Petitioner was admitted and discharged the following day, on November 9, 2019, with final diagnoses including migraine headaches and peripheral neuropathy. *Id*. at 7-8.

---

[4] The amount for unreimbursed expenses is not in dispute.

[5] That ruling will be set forth in the transcript from the hearing, which has not yet been filed but is fully incorporated into this Decision.

On November 13, 2019, Petitioner saw neurologist Yan Qi, M.D., and reported extreme fatigue, bilateral leg weakness that gradually spread to the arms, and walking with a cane. Ex. 3 at 22. Dr. Qi's differential diagnosis included GBS and "neurolyme vs. west nile virus infection," and he recommended that Petitioner go to the hospital for further evaluation. *Id*.

That same day at the emergency department, a physical examination revealed right leg weakness, bilateral weak grip strength, trace patellar reflexes, and no focal neurological deficits. Ex. 4 at 13. Petitioner was admitted to the hospital for six days, until November 19, 2019. *Id*. at 12-232. Petitioner was initially diagnosed with ascending neuropathy, weakness, and paresthesias. *Id*. at 23. A CSF analysis was normal, and an EMG revealed evidence of a demyelinating sensorimotor peripheral polyneuropathy. *Id*. at 23, 25, 174. Petitioner was prescribed Cymbalta and Lyrica, as well as five doses of IVIG, after which petitioner reported improvement. *Id*. at 29, 197. Petitioner was discharged to inpatient rehabilitation with a final diagnosis of GBS. *Id*. at 197.

From November 19 - 26, 2019, Petitioner was admitted for inpatient rehabilitation and participated in physical therapy ("PT") and occupational therapy ("OT"). Ex. 7. At the time of discharge, Petitioner was using a rolling walker and taking Cymbalta and gabapentin. *Id*. at 3-4. After being discharged home, Petitioner continued with some outpatient PT until meeting his goals, consisting of nine sessions between December 2019 and January 2020. Ex. 6 at 3-4.

On February 5, 2020, four months after vaccination, Petitioner had a neurology appointment with Jeffrey Gould, M.D. Ex. 2 at 43. Examination revealed a mildly positive Romberg test, absent reflexes, and mildly reduced length-dependent vibration sensation. *Id*. at 45. Dr. Gould's assessment was GBS, gait disturbance, neuropathy in both feet, fatigue, and migraine, and he recommended continuing with medications. *Id*. at 43.

On May 6, 2020, seven months after vaccination, petitioner saw his PCP for a bilateral ear blockage. Ex. 2 at 41. At that time, it was noted that Petitioner had "[r]ecovered fro[m GBS] with no residual [symptoms]." *Id*.

On May 15, 2020, and November 6, 2020 (seven and thirteen months after vaccination, respectively), Petitioner had neurology follow-up video telemedicine visits with Dr. Gould. Ex. 2 at 19-20, 33-34. Petitioner reported being unable to work as many hours as he did prior to vaccination due to fatigue. *Id*. at 21, 35. Neurological examinations, albeit conducted over video and not in person, were essentially unremarkable and normal. *Id*. at 22, 36. Dr. Gould's assessments remained the same as the previous visit. *Id*. at 19-20, 33-34.

On January 25, 2021, one year and three months after vaccination, Petitioner underwent an EMG of the right upper extremity, which revealed mild median neuropathy at the right wrist, indicative of carpel tunnel syndrome; chronic length-dependent axonal sensorimotor peripheral polyneuropathy; and no evidence of right cervical radiculopathy. Ex. 4 at 7-11.

On March 10 and July 23, 2021, Petitioner saw Dr. Gould for follow-up appointments. Ex. 2 at 9-10, 14-15. Dr. Gould's assessments were unchanged. *Id*. Due to lower back pain, Petitioner underwent a lumbar spine x-ray on May 17, 2022, which indicated degenerative changes. Ex. 8 at 19. From May to July 2022, Petitioner participated in seven PT sessions for chronic back pain, unrelated to his GBS. *Id*. at 3-18.

On June 3 and August 5, 2022, Petitioner saw Dr. Qi and reported increasing tingling and numbness in his right fingertips and both feet. Ex. 10 at 1-5. Dr. Qi's assessment at each visit was a history of peripheral neuropathy, GBS, and migraines; and increasing paresthesias in the feet and right fingers. *Id*. at 2, 5. Dr. Qi recommended continuing with Lyrica. *Id*. He opined that he doubted Petitioner suffered from chronic inflammatory demyelinating polyneuropathy ("CIDP") and that Petitioner had a progression of idiopathic peripheral polyneuropathy. *Id*. At the June visit, Dr. Qi noted that Petitioner had recovered from his GBS. *Id*. at 2.

On September 8, 2022, now three years after vaccination, Petitioner returned to Dr. Qi and underwent an EMG of his lower extremities. Ex. 10 at 6-10. Dr. Qi interpreted the EMG as indicating chronic, severe, sensory greater than motor, axonal, peripheral polyneuropathy and chronic nerve degeneration, but no evidence to suggest CIDP. *Id*. at 7-8. Dr. Qi also commented that Petitioner's neuropathy appeared to have progressed since his prior EMGs. *Id*. at 7.

On May 5, 2023, Petitioner had a follow-up appointment with Dr. Qi and complained of slightly worsening paresthesias in his feet. Ex. 11 at 3-5. Physical examination revealed normal muscle strength and tone in all extremities, symmetric deep tendon reflexes, depressed bilateral knee jerks, and decreased pinprick sensation in the feet. *Id*. at 5. Dr. Qi's assessment was paresthesias in the hands and feet secondary to severe, sensory greater than motor, axonal, peripheral polyneuropathy. *Id*. Dr. Qi opined there was no evidence of CIDP and instructed Petitioner to continue with Lyrica. *Id*.

Several months later, on November 10, 2023, Petitioner had a follow-up appointment with Dr. Qi for ongoing paresthesias in his feet and fingertips. Ex. 12 at 3. Physical examination and Dr. Qi's impression were unchanged from petitioner's May

2023 visit. *Id*. at 4. Dr. Qi prescribed Petitioner a topical transdermal cream for the neuropathic foot pain. *Id*.

On June 18, 2024, Petitioner returned to Dr. Qi for a repeat EMG. Ex. 13 at 1. Dr. Qi interpreted the EMG as indicating moderate bilateral carpal tunnel syndrome and left ulnar sensorimotor neuropathy. *Id*. at 2.

### B. Witness Statements

Petitioner submitted one signed affidavit in support of his claim, executed on November 21, 2022. Ex. 9. In his affidavit, Petitioner recounts the onset of his GBS symptoms, his fear while staying in the hospital (including a time he slipped while going to the bathroom), and the slow progress of his recovery in rehab. *Id.* Petitioner recounts that at the start of his rehab, his hand strength was assessed at only 10% of normal and that he could only walk with the assistance of a walker. *Id.* ¶ 4. He further states that it did not feel like he returned to a normal level of stamina until about five months after his diagnosis, and that the medications he was taking made him feel fuzzy in terms of thought process and concentration, which impacted the amount of work he could do at his landscaping business. *Id.* ¶ 6. Finally, Petitioner describes how he still has discomfort at night and has to limit the amount of time he spends on his feet at work to help mitigate pain. *Id.* ¶ 7.

### III. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when

determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with the determinations of other special masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

## IV.    The Parties' Arguments

The sole issue in dispute is determining an appropriate award for Petitioner's past pain and suffering damages. Petitioner requests $165,000.00, and in support cites the following cases: *Longo v. Sec'y of Health & Hum. Servs.*, No. 21-844V, 2023 WL 9326039 (Fed. Cl. Spec. Mstr. Dec. 20, 2023) (awarding $160,000.00); and *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880 (Fed. Cl. Spec. Mstr. Jul. 29, 2019) (awarding $170,000.00).

Respondent has countered with $115,000.00 for pain and suffering. In support, Respondent has offered *Tennyson v. Sec'y of Health & Hum. Servs.,* No. 21-2084V, 2024 WL 3738740 (Fed. Cl. Spec. Mstr. July 3, 2024), as a comparable.

## V.    Appropriate Compensation in this Case

### A. Pain and Suffering

In arriving at a pain and suffering award, I review the facts and circumstances of the petitioner before me, in the context of other cases and precedent. GBS is a particularly concerning and frightening condition, and the pain and suffering award should reflect that. Reasoned decisions, rather than cases resolved on proffer, provide the best comparable cases for arriving at an award when the parties are unable to resolve damages through negotiations. But ultimately the facts of the case at issue are the most significant factor.

This record establishes that Petitioner experienced a moderate case of GBS. Although he required hospitalization and inpatient rehabilitation, his stay was not as protracted as in more severe presentations of GBS, and involved largely IVIG treatment. Although at the beginning of his rehab Petitioner required the use of a walker to ambulate, he recovered well enough that three months later he was told he could return to work

(albeit at a reduced schedule). He requires the consistent use of medication to manage his symptoms, but Petitioner can thankfully be said to have largely made a full recovery. This is particularly true in light of Petitioner's pre-existing neuropathy, which has no doubt contributed to his ongoing symptoms.

The overall course of Petitioner's GBS was less severe than what other claimants experienced in the comparable cases offered by Petitioner. For example, the *Longo* petitioner experienced a similar hospitalization length, one round of IVIG, but had many more sessions of outpatient rehab, 36 compared to nine in the instant case. *Longo*, 2023 WL 9326039, at *3. The petitioner in *Longo* also had over two years of documented symptoms related to his GBS, compared to the instant case in which there is no doubt that Petitioner's pre-existing neuropathy has contributed to his ongoing symptoms. And the *Bircheat* petitioner exhibited a far more severe course of GBS than the instant case – 24 days of inpatient rehab following a 7 day hospitalization, during which intubation was required for feeding. *Bircheat,* 2021 WL 3026880, at *3 That individual also underwent 21 sessions of outpatient PT, 8 sessions of occupational therapy, and 5 sessions of speech therapy. *Id.*

Respondent's cited case does not serve as too-useful of a comparable because although it was decided during a previous Motions Day hearing, the written decision did not contain a detailed recitation of the facts or reasoning.

Ultimately, Respondent's proposed amount is too low based on the amount of hospitalization, rehab, and length of ongoing symptoms. Based on these same criteria, however, Petitioner's proposed amount is too high. Both comparable cases offered by Petitioner involve more severe presentations of GBS, and while Petitioner has had to maintain taking medication for his symptoms, he also has not required any further care, with appointments only being made for regular check-ups rather than more active treatment. Although it is ultimately impossible to determine how much of Petitioner's ongoing neuropathy is related to his GBS versus his pre-existing condition, the amount of hospitalization and rehab is similar to other moderate presentations of GBS.

Based upon the facts of this case and the reasoning contained in this decision as well as my oral ruling at the January 24, 2025, hearing, I find that Petitioner should be awarded $135,000.00 for his past pain and suffering.

### B. Unreimbursable Expenses

The parties agree that Petitioner should be reimbursed $4,015.36 for past unreimbursed expenses. Brief at 1; Resp. at 10. This amount shall be awarded in full.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $135,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[6] I also find that Petitioner is entitled to $4,015.36 in actual unreimbursable expenses.**

**I therefore award Petitioner a lump sum payment in the amount of $139,015.36 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[7]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**

Brian H. Corcoran
Chief Special Master

---

[6] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.